UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSHUA QUINCY BURNS,

    Petitioner,

v.

HEIDI WASHINGTON,

    Respondent.

Case No. 18-10606
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING
PETITION FOR WRIT OF HABEAS CORPUS**

On March 15, 2014, Joshua Quincy Burns was feeding his infant daughter, Naomi, when he received a phone call from his wife. Burns claims that as he put the phone down, Naomi started to fall off his knee and he grabbed her head to prevent her from falling or hitting the coffee table. A day later, Naomi vomited, appeared pale and clammy, and refused a bottle, so her parents took her to the emergency room. While physicians initially believed that the symptoms were caused by a virus, additional tests found subacute blood in her cerebellum along with multilayered retinal hemorrhages in both eyes; which, in combination, led to suspicion of child abuse. (R. 6-22, PageID.2754.) Shortly after, Burns was charged with, and eventually convicted of, second-degree child abuse. The state's case relied heavily on the testimony of child abuse pediatrician Dr. Bethany Mohr, who opined that Naomi's retinal hemorrhaging was the result of abusive head trauma.

Burns now files a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Burns says trial counsel was constitutionally ineffective for not challenging overly broad

testimony by Dr. Mohr regarding her diagnostic level of certainty, and for not properly using an e-mail chain between Dr. Mohr and another doctor to impeach Dr. Mohr.

The Court has reviewed the petition, the Warden's response, the state-court record, and heard oral argument on April 15, 2019. Primarily because the Michigan Court of Appeals did not unreasonably apply controlling Supreme Court precedent, the Court will deny the habeas petition.

## I.

On March 15, 2014, Brenda Burns was at a hair appointment and called her husband, Joshua Burns, before leaving to come home. When Brenda returned home, Burns was holding their infant daughter, Naomi, and appeared concerned. (ECF No. 6-11, PageID.1105, 1108, 1110.) Burns told Brenda that he had been burping Naomi during their call and when he went to hang up the phone, Naomi "lurched and began to fall forward and almost hit the coffee table." Burns "had to reach his hand out to prevent her head from hitting the coffee table." (ECF No. 6-11, PageID.1111.) Burns told the jury that when Brenda returned home, he was "upset," "I said you're not gonna believe what happened[:] Naomi almost—Naomi just fell off my knee and almost hit the coffee table." (ECF No. 6-13, PageID.1576.)

The next morning, Naomi had loose stool and projectile vomiting. (ECF No. 6-11, PageID.1129–1130.) She also refused her bottle, appeared pale and clammy, and had a low temperature. Naomi's pediatrician suggested that, if the parents were concerned, they should take Naomi to the emergency room. (ECF No. 6-11, PageID.1138–1139.) Upon examination, a scratch was noted, along with a small bruise by Naomi's eye. Burns recounted the episode from the day before. Naomi was ultimately discharged with a diagnosis of possible gastrointestinal virus. (ECF No. 6-11, PageID.1146.) Later that evening, Naomi had additional vomiting episodes. When her condition did not improve, her parents took her back to the hospital. Naomi was diagnosed, on

March 17, with norovirus and discharged later that afternoon. (ECF No. 6-11, PageID.1160–1161.) That night, Naomi had another vomiting episode.

Naomi's condition did not improve, and she was taken back to C.S. Mott Children's Hospital two more times.

Several days later, results from an earlier test indicated a possible metabolic issue which prompted ophthalmology to examine Naomi. Dr. Cagri Besirli, a retina specialist, along with another ophthalmologist decided that the findings did not fit any possible metabolic disorders. (R. 6-14, PageID.1785.) In a subsequent examination, Besirli found numerous retinal hemorrhages in both of Naomi's eyes.

Dr. Besirli saw "several large retinal hemorrhages in the preretinal area, numerous ones in the intraretinal space" that "were too many to count." (ECF No. 6-14, PageID.1793–1794.) Naomi had similar hemorrhages in both eyes. These findings led to a suspicion that abusive head trauma—sudden acceleration/deceleration of the head—had caused the injuries.

Dr. Douglas Joseph Quint, a neuroradiologist at the University of Michigan Medical Center, was sent Naomi's imaging to review as part of his role on the child protection team at the University of Michigan. (ECF No. 6-14, PageID.1727–1728.) In reviewing a March 18, 2014, MRI he "saw blood at least several days old, probably two to four days old . . . in the lower part of the brain which had not been described in the initial report." (ECF No. 6-14, PageID.1732.)

Dr. Bethany Mohr, a child abuse pediatrician at the University of Michigan, was contacted on March 26 because abuse was suspected. (ECF No. 6-10, PageID.804.) Mohr first examined Naomi on March 27 after having read her medical records. (ECF No. 6-10, PageID.806.) At that time doctors had not yet reached a diagnosis to explain everything that was happening with Naomi. (ECF No. 6-10, PageID.809.) Mohr spoke with Burns and Brenda separately, as is custom when

3

abuse is suspected. (ECF No. 6-10, PageID.811.) She also reviewed the March 18 MRI with Dr. Quint. (ECF No. 6-10, PageID.819, 821.) This review revealed newer blood in addition to older blood, with the newer blood being "three [to] seven or four to seven" days old and the older being possibly dating "back to birth." (ECF No. 6-10, PageID.823–825.) As of that day, Mohr was "highly suspicious" that the diagnosis was "most likely abusive head trauma" but she wanted to review the MRI that was done that day as well as talk with the ophthalmologist, Dr. Besirli. (ECF No. 6-10, PageID.860.) So Mohr reviewed the MRIs—the one from March 18 and the new one done March 27—with Quint. (ECF No. 6-10, PageID.862–863.) On April 4 Mohr submitted her final report with a final diagnosis of abusive head trauma. (ECF No. 10, PageID.876–879.)

Burns was subsequently charged with second-degree child abuse.

At trial, the cause of Naomi's retinal hemorrhaging was the source of significant dispute. Naomi had a difficult birth. Brenda labored for several hours and doctors unsuccessfully tried to aid delivery using a vacuum device. (ECF No. 6-10, PageID.813–814.) Naomi was eventually delivered via C-Section. (ECF No. 6-10, PageID.814.) Naomi also had thrombocytosis—she produced too many platelets. (*See* ECF No. 6-15, PageID.2035.) Whether the birth trauma and thrombocytosis threw the abusive-head-trauma diagnosis into doubt was the heart of the debate between the testifying experts.

Quint testified that Naomi's birth trauma could explain the older hematoma they found on the MRI, but not the newer one. (ECF No. 6-14, PageID.1746.) He testified that two-to-seven-day-old blood should not be present in a nine-week-old baby. (ECF No. 6-14, PageID.1760.) He further testified that subdural hematomas he viewed on the first two MRIs done on March 18, 2014 and March 27, 2014 could be consistent with abusive head trauma, adding, "I don't see any other changes to suggest a medical reason for this child having . . . subdural hematomas of different

4

ages." (ECF No. 6-14, PageID.1750.) When asked what kind of accidental trauma could create subdural hemorrhages like he saw in the cerebellum of Naomi's brain, Quint answered, "High speed motor vehicle accident." (ECF No. 6-14, PageID.1772.)

And when Besirli testified at trial, although aware that a vacuum device was used during Naomi's delivery, he nonetheless concluded that Naomi's retinal hemorrhages could not have been from birth. Naomi was about 70 days old, and Besirli testified that "retinal hemorrhages caused by birth trauma typically resolve in the first week to 10 days after birth." (ECF No. 6-14, PageID.1801.) Besirli further explained that the hemorrhages seen in birth trauma are "located at the posterior pole around the optic nerve and the macula in about 70 percent of the cases—in 90 percent of the cases and only about one-third of the time they extend to pass what we called zone one, which is the retinal periphery." (ECF No. 6-14, PageID.1801-1802.) So all told, according to Besirli, the extent of Naomi's hemorrhages "were not consistent" with birth-trauma hemorrhages. (ECF No. 6-14, PageID.1802.) Besirli also testified that "typically when [the hemorrhages are] in the different layers that really narrows down the possible causes of what may have caused [them]." (ECF No. 6-14, PageID.1793–1794) And "in [Naomi's] age group the two most common causes of retinal hemorrhages with this distribution would be abusive head trauma or accidental trauma." (ECF No. 6-14, PageID.1795.) But the accidental trauma is typically "severe accidental trauma. Motor vehicle accident. Falling off several flights of stairs." (*Id*.) And the abusive head trauma is typically a "sudden acceleration deceleration of the head." (*Id*.) As to the thrombocytosis, Besirli testified that he could not opine on the effect of Naomi's thrombocytosis on retinal hemorrhages, stating that he "[didn't] have any evidence for or against that any platelet count increase can cause retinal hemorrhages." (ECF No. 6-24, PageID.1810.)

5

Dr. Mohr also testified at length during the trial. She explained the basis for her diagnosis of abusive head trauma, including the effects of Naomi's difficult birth and thrombocytosis on that diagnosis. She acknowledged that retinal hemorrhages can have different causes, and that a difficult birth could cause hemorrhages in a child who was just born. (*See* ECF No. 6-10, PageID.946–947.) She further acknowledged that thrombocytosis could be a "modulating factor" (explained as "[s]omething that can change the appearance or change what's going on") in retinal hemorrhaging. (ECF No. 6-10, PageID.1034–1035.) She clarified, however, that high platelets or thrombocytosis would not cause retinal hemorrhages, just that retinal hemorrhaging could worsen with a high platelet count. (ECF No. 6-10, PageID.1034.) She testified that "[she did] not feel that Naomi's thrombocytosis would give us multi-layered retinal hemorrhages to the ora serrata. In combination also factoring in all the other things that we have as well." (ECF No. 6-10, PageID.1047.) So Mohr concluded, based on the facts of the case and Naomi's various test results that the diagnosis for her injuries was abusive head trauma. Mohr told the jury,

> [T]he fact that [Naomi] had multi-layered retinal hemorrhages in one eye and three different layers that they go all the way 360. So that's not indicative of some type of minor trauma or some other condition which the majority of those conditions were ruled out. That's very very highly specific for repetitive acceleration deceleration . . . [A]nd you wouldn't even get them from crawling. These are the types of hemorrhages outside of being from abusive head trauma would be from a crush injury. So maybe a huge heavy TV falling on top of a baby or a child they have been seen in those cases or roll over motor vehicle collisions where you have that repetitive acceleration deceleration. But obviously none of those things were part of the history and there were no external signs of trauma so a crush injury those types of things wouldn't make sense either.

(ECF No. 6-10, PageID.866.)

While Mohr suspected abusive head trauma before the official diagnosis, she testified that she did not reach her final conclusion until after "getting official reports and reviewing all of the studies and specifically the diagnostic testing labs including the bleeding [and] coagulopathy

6

workup to making sure that there wasn't an [underlying] bleeding disorder and also making—getting the final results from the metabolic testing." (ECF No. 6-10, PageID.877.)

Burns presented experts of his own to counter Mohr's opinion. As explained by Burns, the defense experts' "testimony presupposed that [shaken baby syndrome/abusive head trauma] was a valid diagnosis but questioned its application in this case." (ECF No. 7, PageID.3385.) These experts testified that Naomi's birth trauma, thrombocytosis, and the short fall from her father's lap provided the best explanation for her condition.

Ultimately, Burns was convicted of second-degree child abuse.

Burns appealed his conviction and it was affirmed. *People v. Burns*, No. 327179, 2016 WL 6495853 (Mich. Ct. App. Nov. 1, 2016); *lv. den.* 896 N.W. 2d 422 (Mich. 2017).

Burns seeks habeas corpus relief on two of the claims raised during his direct appeal: that his defense counsel provided ineffective assistance by failing to raise a *Daubert* challenge to portions of Dr. Mohr's testimony regarding her level of diagnostic certainty that Naomi's retinal hemorrhaging was the result of abusive head trauma and by failing to use an email exchange between Dr. Mohr and another expert to impeach her testimony. Neither persuades.

## II.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") (and 28 U.S.C. §2254 in particular) "confirm[s] that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011), *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). If a claim was "adjudicated on the merits in State court proceedings," this Court cannot grant habeas corpus relief on the basis of that claim "unless the adjudication of the claim . . . resulted in a decision" (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d).

On direct appeal, the Michigan Court of Appeals addressed on the merits the ineffective assistance of counsel claims raised in Burns' habeas petition. So § 2254(d) applies.

### III.

"An ineffective assistance claim has two components: [Burns] must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687(1984)). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The reviewing court must "indulge a strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 689–90. An additional layer of deference applies when ineffective assistance is claimed in a petition for habeas corpus. *See Harrington*, 562 U.S. at 101 ("[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."). In this procedural stance, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles*, 556 U.S. at 123 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)); *see also Harrington*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.").

To satisfy the prejudice prong, Burns must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id.* at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.*

### A.

Burns first claims that his trial counsel was ineffective for failing to bring a *Daubert* challenge to portions of Mohr's testimony.

Burns' "challenge to Mohr's testimony is narrowly focused on the unjustifiable diagnostic certainty of abuse to which Dr. Mohr testified while relying primarily on retinal hemorrhages." (ECF No. 7, PageID.3385.) He focuses on two aspects of Mohr's testimony. For one, Burns believes his counsel should have sought to preclude the following testimony on direct: "It's not necessarily again the presence of them [retinal hemorrhages] it's the fact that [Naomi] had multi-layered retinal hemorrhages in one eye and three different layers that they go all the way 360. So that's not indicative of some type of minor trauma or some other condition which the majority of those conditions were ruled out. That's very very highly specific for repetitive acceleration deceleration[,]" (ECF No. 6-10, PageID.866). And second, Burns complains of Mohr's response to a question from a juror. The juror asked, "In your experience, what percentage of cases are diagnosed as child abuse . . . when there is the presence of a subdural hematoma, subacute intracranial bleeding, and severe retinal hemorrhage all in combination?" to which Mohr responded, "in the absence of a motor vehicle collision or some type of severe crush injury, that would be highly, highly specific. So probably close to 100% if you exclude those other causes." (ECF No. 6-17, PageID.2477.)

According to Burns, there was no scientific basis for Mohr's stated certainty in the diagnosis and Burns' trial counsel was constitutionally ineffective for failing to seek to exclude those statements through a *Daubert* hearing.

The Michigan Court of Appeals rejected this argument. It found that

> In support of [Burns' contentions], [Burns] refers us to several articles that point out that retinal hemorrhage can result from causes other than abuse. However, none of the articles dispute the view that abuse is a likely, if not the most likely, cause of such injuries in infants, and none appear to consider the likelihood of an accident consistent with that defendant described. Defendant makes a credible argument that Dr. Mohr's statement involving "close to 100%" is subject to criticism as overbroad, but defendant does not present scientific literature sufficient to demonstrate that Dr. Mohr's opinion as to the cause of the child's injury was inconsistent with generally accepted scientific principles and methods. Defendant does not provide any legal analysis to show that defense counsel would have succeeded with an attempt to have Dr. Mohr's opinion evidence excluded.
>
> In *People v. Ackley*, 497 Mich. 381, 391–302; 870 NW2d 858 (2015), our Supreme Court acknowledged the "prominent controversy within the medical community regarding the reliability of [shaken-baby syndrome or abusive head trauma] diagnoses" and concluded that defense counsel was ineffective in that case for failing to become adequately versed in that technical subject matter or engage an expert to rebut the state's expert. *Id*. at 392. By contrast, in this case defense counsel did retain two experts in an attempt to rebut Dr. Mohr's conclusions, but even these experts testified that the victim's retinal hemorrhages were consistent with abusive head trauma, that retinal hemorrhaging is "pretty darn specific for trauma," that "subdural hematomas and retinal hemorrhages of the type [the victim] had are usually diagnostic of abusive head trauma," that the science with respect to shaking as a mechanism for producing multilayered retinal hemorrhages was a "good theory," that the mechanisms other than abuse for retinal hemorrhages were generally rollover type accidents or head crushing accidents, and that "stopping and starting repeatedly often is the primary culprit" behind head trauma of the sort at issue. One defense expert testified that in his practice he had "never had a child under three months of age, who had subdural hematomas and the extensive bilateral multilayer retinal hemorrhaging that [Naomi] had, not be diagnosed as suffering from abusive head trauma."
>
> Accordingly, testimony from defendant's own experts undermines defendant's argument that the challenged testimony from the prosecution's expert was "junk science." The controversy within the medical community noted by defendant on appeal presents, at least in this case, a question of credibility, a so-called battle of the experts, as the court below noted. The question was therefore properly placed before the jury and defense counsel, in addition to presenting his own experts, extensively criticized the reliability of the prosecution's expert's opinion through cross-examination and closing argument. For these reasons, defendant has failed to show any deficiencies in defense counsel's performance in connection with the prosecution's expert's trial testimony.

*Burns*, 2016 WL 6495853, at *4–5.

This Court cannot say that this finding was unreasonable. *See Knowles*, 556 U.S. at 123.

Abusive head trauma, as Burns acknowledges, is a generally accepted diagnosis. While it is true that the thrust of Mohr's opinion was based on Naomi's retinal hemorrhages, viewing her testimony as a whole reveals that she considered other factors—especially the cerebellar blood and the absence of any history of any trauma or injury that would explain her retinal hemorrhages. As Mohr testified:

> A. But again in the context and in the setting of having retinal hemorrhages and cerebellar hemorrhage that's diagnostic of abuse that new bleeding becomes much more concerning for abuse than simply from what was reported.
>
> Q. And so you look at all those things together correct?
>
> A. Correct.
>
> Q. You didn't make a final diagnosis until you had received all of the labs and the results from all of the different metabolic and all these other things that you were looking at?
>
> A. Correct.

(ECF No. 6-10, PageID.881.)

The record also supports that Mohr utilized an appropriate methodology before rendering her opinion. She physically examined Naomi. She obtained Naomi's medical history from Brenda Burns. She reviewed Naomi's studies and diagnostic testing (including MRI's, an ophthalmological exam, records of hospital stays). She consulted with ophthalmologist Dr. Bersirli and neuroradiologist Dr. Quint. At trial, Bersirli testified that the severity of Naomi's retinal hemorrhages required the force of falling off several flights of stairs or a car accident and Quint testified that bleeds of two different ages inside a baby raise red flags for abusive head trauma. Mohr also did a differential diagnosis—she considered but ruled out alternative causes.

11

And the testimony from Burns' defense experts further supports his trial counsel's strategy of presenting a battle of the experts. Again, his experts presupposed that abusive head trauma was a valid diagnosis but "questioned its application in this case." (ECF No. 7, PageID.3385). Drs. DeGraw and Guertin disagreed with Mohr and testified that Naomi's birth trauma, thrombocytosis, and the short fall from her father's lap provided the best explanation for her condition; they further testified that "using [significant retinal hemorrhages] as a definite marker for abusive head trauma is . . . not good science. It's not good medicine." (ECF No. 6-15, PageID.2126, 2054.) But the Court of Appeals correctly observed that significant portions of their testimony were consistent with Mohr's diagnosis. Indeed, Guertin testified, "Although there are some people who question that you could shake a baby hard enough to cause subdural hemorrhages. I must tell you though in cases of my own . . . that's what the kid had." (ECF No. 6-14, PageID.1890.)

The expert Burns retained for his new trial motion also lends support to a battle-of-the-experts defense. He opined that "although upon first review this case may appear as child abuse because of the combination of retinal and subdural hemorrhage in association with declining mental status and respiratory failure, the medical facts of this case lead to a more medically plausible explanation. The circumstances of Naomi's birth and subsequent admission with subdural hemorrhage can be attributed to her vacuum delivery, and there is nothing specific about the retinal findings to suggest angular acceleration-deceleration injury of shaking." (ECF No. 1-3, PageID.58.)

Mohr, by contrast, believed abusive head trauma was a valid diagnosis in this case and that the severity of the hemorrhages and the new bleed did suggest, to a high level of certainty, acceleration-deceleration injury of shaking.

Which expert's opinion is the more medically plausible or whether one expert opined with an inflated level of certainty are proper issues for the jury. The Court of Appeals did not unreasonably apply *Strickland* in finding this was a legitimate battle-of-the-experts issue for the jury, such that defense counsel did not provide deficient performance in pursuing this route as opposed to a *Daubert* challenge.

The affidavit from Burns' trial counsel does not change that conclusion. In this affidavit, Burns' counsel states that he knew based on reading Mohr's reports that she would testify that Naomi's symptoms—and especially her retinal hemorrhages—were "highly specific for child abuse through shaking" and that, based on reading expert reports and consulting defense witnesses, experts would disagree with her conclusion. (ECF No. 1-2, PageID.52–53.) He then says that he now believes that he "had a basis" to challenge the admissibility of that statement. (ECF No. 1-2, PageID.53.) He also states that, even though he did object during the juror's question to Mohr, he "should have further objected and asked for a curative instruction." (*Id*.) But this does not mean that he performed deficiently, and that Burns has shown that his "counsel failed to act 'reasonabl[y] considering all the circumstances.'" *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 688). And given the circumstances, and the manner in which the jury question was asked and that his counsel did object once during the juror's question, Burns cannot mount the high bar of showing that the Michigan Court of Appeals was unreasonable in determining that his counsel's representation was not constitutionally deficient.

And even assuming that counsel was deficient in failing to raise a *Daubert* challenge, the record suggests it would not have been a successful challenge. Again, the Michigan Court of Appeals noted,

> defendant refers us to several articles that point out that retinal hemorrhage can result from causes other than abuse. However, none of the articles dispute the view

13

> that abuse is a likely, if not the most likely, cause of such injuries in infants, and none appear to consider the likelihood of an incident consistent with what defendant described. Defendant makes a credible argument that Dr. Mohr's statement involving "close to 100%" is subject to criticism as overbroad, but defendant does not present scientific literature sufficient to demonstrate that Dr. Mohr's opinion as to the cause of the child's injury was inconsistent with generally accepted scientific principles and methods. Defendant does not provide any legal analysis to show that defense counsel would have succeeded with an attempt to have Dr. Mohr's opinion evidence excluded.

*Burns*, 2016 WL 6495853, *4. Even though this discussion appears to be couched within the deficient performance prong of the *Strickland* analysis, it applies to the prejudice prong as well.

And the Michigan Court of Appeals quoted extensively from the trial court's ruling on Burns' motion for a new trial in which he raised the same ineffective-assistance-of-counsel claims. That ruling further suggests that Burns was unlikely to succeed on a *Daubert* challenge. The court did not believe a *Daubert* challenge was the answer to Mohr's testimony. Instead, the state trial court believed the battle of the experts was an issue for the jury to decide. The trial court said, "[W]hen I review [defense counsel's] affidavit it's almost as if he's looking back again now with the benefit of hindsight maybe the better strategy would have been to have gone down the *Daubert* route to see if he could have been successful in excluding all or part of [the prosecution's expert's] testimony which in the end I'm not even sure he would be successful at." *Id*. at *3. The court further explained that the "disagreement in the medical community regarding this issue with regards to abusive head trauma and other explanation[s] for children to have those types of injuries that [the instant victim] had . . . is a question for the jury to decide. . . . I'm not confident that a *Daubert* hearing is the mechanism by which the Court's not going to decide creditability [sic] issues." *Id*. And the trial court was "not convinced that the result would have been different because

I'm not even sure that he . . . would've been successful at a *Daubert* hearing. And I've got to show that there's a reasonable probability and I don't find that to be the case here." *Id.*[1]

On this record, the Court cannot find that a *Daubert* challenge to Dr. Mohr's level of diagnostic certainty was likely to be successful. This precludes a finding of prejudice (as well as a finding that the Michigan Court of Appeals was unreasonable in finding no deficient performance).

Burns puts forth three arguments for why the Michigan Court of Appeals' decision involved an unreasonable application of Supreme Court precedent. None persuade.

First, Burns argues that the appellate court improperly placed the burden on him to demonstrate the success of the *Daubert* challenge when that burden is on the prosecution. (ECF No. 1-1, PageID.43–44.) The Court does not agree with Burns' characterization of the state court's decision. The Michigan Court of Appeals was not ruling on a *Daubert* challenge, it was ruling on an ineffective-assistance-of-counsel claim. And, applying *Strickland*, the court was looking at the strength of a *Daubert* challenge based on the evidence presented.

Second, Burns alleges that the Michigan Court of Appeals took his experts' testimony out of context when it concluded that his own experts undermine his argument that Mohr's opinion was based on "junk science." (ECF No. 1-1, PageID.44.) But Burns has not established that this conclusion was unreasonable. Indeed, the language quoted by the Michigan Court of Appeals accurately portrays the dispute between these experts—Burns' experts acknowledged that retinal hemorrhaging is a valid theory and highly indicative of trauma, they just opined that other factors

---

[1] The Court is mindful that it has "no power to tell state courts how they must write their opinions," *Coleman v. Thompson,* 501 U.S. 722, 739 (1991) and that "[t]he caseloads shouldered by many state appellate courts are very heavy, and the opinions issued by these courts must be read with that factor in mind." *Johnson v. Williams*, 568 U.S. 289, 300 (2013). So while not entirely clear, the Court believes the Michigan Court of Appeals was addressing both *Strickland* prongs. And even if not, this Court would still find no prejudice under a *de novo* review. *See Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012).

15

led them to believe that it was not *the* cause in this case. And the Court of Appeals does not represent that Burns' experts support Mohr's stated certainty in her opinion on cause. It states that Burns' experts "testified that the victim's retinal hemorrhages were consistent with abusive head trauma" and that is indeed accurate. Being consistent with does not state that it was the cause. Burns cannot show that the Court of Appeals' decision was based on an unreasonable determination of Burns' experts' testimony.

Lastly, Burns believes the Michigan Court of Appeals applied the wrong legal standard. In analyzing the prejudice prong, *Strickland* requires a defendant to show a reasonable probability that the outcome of the proceeding would be different, while the Michigan Court of Appeals, in one section of its opinion, stated that Burns would be required to "show that the outcome of the proceeding would have been different but for counsel's errors." *Burns*, 2016 WL 6495853, at *2. But just prior to this language, the Michigan Court of Appeals stated the correct standard, that "In order to prove that defense counsel failed to provide effective assistance, the defendant must establish that '(1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced defendant.'" *Id*. (internal citation omitted). And the Sixth Circuit recently reiterated in a similar situation that, giving the state court opinion the "benefit of the doubt," as the federal courts must, a state court does not misapply Supreme Court precedent when, despite misstating a legal standard once, it properly cites that standard elsewhere in the opinion. *See Johnson v. Genovese*, 924 F.3d 929, 937–38 (6th Cir. 2019) (citing *Holland v. Jackson*, 542 U.S. 649 (2004)). Indeed, the Michigan Court of Appeals incorporated the trial court opinion on the motion for a new trial which explicitly stated the correct prejudice standard. *Burns*, 2016 WL

16

6495853, at *3. And when the Michigan Court of Appeals analyzed prejudice under Burns' second ineffective assistance of counsel claim, the court again applied the proper standard. *Id*. at *5.

Burns is not entitled to relief on his first claim.

**B.**

Burns' second claim is that he was denied the effective assistance of counsel because his trial counsel failed to properly use an e-mail exchange between Dr. Mohr and Dr. Alex Levin, the Chief of Pediatric Ophthalmology and Ocular Genetics at the Wills Eye Institute in Philadelphia, with whom Mohr had consulted by e-mail. Defense counsel was unsuccessful in getting the e-mail admitted into evidence. According to Burns, his counsel should have used the e-mail to impeach Mohr because the communication suggested that she had "already made up her mind and was not open to reconsidering her diagnosis, a showing that goes directly to the credibility of her diagnosis." (ECF No. 1-1, PageID.47.)

In this e-mail exchange with Levin, Mohr described Naomi's symptoms and hospital stays. She indicated that Naomi "[h]ad a difficult birth—unsuccessful [vacuum assisted delivery]." (ECF No. 1-4, PageID.62.) She attached images for Levin to review and gave a detailed summary of the ophthalmology report. At the end of the email, she said, "of note, electrolytes always normal; but persistent thrombophilia, 600,000s-9000,000s." (ECF No. 1-4, PageID.63.) This was apparently a reference to Naomi's platelet count and thrombocytosis. Mohr then asked Levin for his "thoughts." (*Id*.) Levin replied, "Impressive documentation. Very well done. Not sure what the question is. I can't think of another diagnosis other than abuse assuming no obvious coagulopathy or other . . . event." (ECF No. 1-4, PageID.66.) Mohr responded, "My question was mainly about what to say (if anything) about the thrombophilia." (ECF No. 1-4, PageID.61.) Levin then responded, "Do you mean thrombocytosis?" and continued, "Either way we have no idea what this might do re retinal

17

bleeding and could be considered to throw the retinal findings into question. We just don't know." (*Id.*) That was the end of the communication.

Burns claims that Mohr abruptly cut off all further contact with Levin because he was calling her diagnosis into question.

At trial, Burns' counsel sought to introduce the email as substantive evidence. The prosecutor objected on hearsay grounds. Burns' counsel tried to continue to lay more foundation for admission, but the trial court stated, "well the objection is hearsay so you, you agree that if she's about to say what [Dr. Levin] stated that would be hearsay? Because I'm going to instruct the witness to not testify to what Dr. Levin said." (ECF No. 6-10, PageID.1039–1040.) In response, Burns' counsel argued that Levin's statements could come in under the medical-diagnosis exception. (ECF No. 6-10, PageID.1040–1042.) The trial court found that the exception did not apply; and, as that was the only argument for its admission, the trial court excluded the statements. (ECF No. 6-10, PageID.1043.) After the hearsay argument failed, Burns' counsel did not argue that the emails could be used to impeach Mohr on her bias and the credibility of her diagnosis given her unwillingness to reconsider her diagnosis in the face of Levin's conflicting opinion.

Burns says his counsel's failure to use the emails to impeach Dr. Mohr deprived him of effective assistance of counsel.

The Michigan Court of Appeals disagreed. The Court believed that Levin's comments in the email were properly excluded as substantive evidence and then ruled that "had defense counsel attempted to introduce the e-mails for impeachment, the trial court could have excluded them for that purpose without abusing its discretion given the likelihood that they would be construed substantively [by the jury], that they lacked explanation . . . , and the fact that Dr. Mohr testified that she did not consider whether the child's thrombocytosis would alter her conclusions.

18

Moreover, the defense has not demonstrated a reasonable probability that admission of the e-mail for a limited purpose would have resulted in a different outcome." *Burns*, 2016 WL 6495853, at *5.

Burns argues that the Michigan Court of Appeals unreasonably applied *Strickland* by "inventing meritless reasons" why the trial court would not allow the contents of the emails to be introduced. (ECF No.1-1, PageID.47–48.) He argues that, in hypothesizing why the trial court could have excluded the emails for impeachment purposes, the Michigan Court of Appeals ran afoul of Supreme Court precedent which cautions reviewing courts that "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (ECF No. 1-1, PageID.48 (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 386–87 (1986)).)

But the Michigan Court of Appeals was looking at the likely success of using the emails to impeach Mohr to determine the prejudice to Burns; it was not assessing deficient performance.[2] So it was not improper for the appellate court to look at whether the trial court would have allowed the evidence in determining whether counsel's failure to seek admittance for the proper reason prejudiced Burns.

And the Michigan Court of Appeals was not unreasonable in finding no reasonable probability of a different outcome had Burns' counsel sought to admit the email for impeachment purposes. Indeed, Levin's concerns about the impact of Naomi's thrombocytosis on the cause of

---

[2] Burns also argues that the Michigan Court of Appeals unreasonably applied *Strickland* by concluding "without any analysis" that his counsel's failure to impeach Mohr with the mails did not prejudice him. (ECF No. 1-1, PageID.48–49.) But the Michigan Court of Appeals properly stated the *Strickland* standard on prejudice. *Burns*, 2016 WL 6495853, at *5. And the Court reads the Michigan Court of Appeals' opinion as discussing prejudice, not deficient performance, and therefore it did not make an unsupported conclusion that Burns had not established prejudice.

19

the retinal hemorrhaging was expressed by the other defense experts. And the basis of the impeachment is quite weak—it is far from clear whether the email exchange ended because Mohr did not want Levin to propose a different cause of the injuries or because he answered Mohr's question and there was nothing further to discuss. Mohr specifically inquired about the thrombocytosis even after Levin initially agreed with her diagnosis of abuse. And his response—that the thrombocytosis could throw the findings into question, he just did not know—did not clearly invite a reply nor did it clearly eliminate a diagnosis of abuse. Thus, the uncertainty as to why Mohr did not further engage Levin coupled with the fact that the jury heard testimony similar to Levin's statement from Burns' experts, form a reasonable basis for the Michigan Court of Appeals' prejudice determination. So § 2254(d) bars habeas corpus relief on this theory.

## IV.

For the foregoing reasons, the Court DENIES Burns' Petition for a Writ of Habeas Corpus. And because jurists of reason would not find it debatable whether the petition states a valid claim of the denial of a constitutional right, *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), the Court also DENIES Burns a certificate of appealability. Burns is granted leave to appeal in forma pauperis.

IT IS SO ORDERED.

s/Laurie J. Michelson  
LAURIE J. MICHELSON  
UNITED STATES DISTRICT JUDGE

Date: July 12, 2019

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, July 12, 2019, using the Electronic Court Filing system and/or first-class U.S. mail.

s/William Barkholz  
Case Manager